DISTRICT OF OREGON, ss:        AFFIDAVIT OF DANIEL JEFFREYS

## Affidavit in Support of a Criminal Complaint and Arrest Warrant

I, Daniel Jeffreys, being duly sworn, do hereby depose and state as follows:

### Introduction and Agent Background

1.    I am Special Agent DANIEL JEFFREYS with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2019. My current assignment is to the FBI Portland Transnational Organized Crime/Homeland Security Task Force.  My current assignment involves the investigation of violent criminals, criminal organizations (including street gangs and drug trafficking organizations), and the possession of firearms by prohibited persons. Based on my training and experience, I am familiar with methods used for illegal drug dealing, illegal firearms dealings, violent crimes, and the laundering of illegal proceeds from these activities.  Additionally, I am familiar with the organization and operation of drug conspiracies and the operation of organized drug and weapon trafficking organizations, such as street gangs and cartels.

2.    My training and experience also includes legal matters related to Fourth Amendment searches, the drafting of criminal complaints, and the investigation of violent federal crimes.

3.    I submit this affidavit in support of a criminal complaint and arrest warrant for LUIS NINO-MONCADA (DOB: xx/xx/1992) for aggravated aassault on a federal officer by using a deadly or dangerous weapon to inflict bodily injury (18 U.S.C. §§ 111(a) and 111(b)), and damaging federal property in excess of $1000 (18 U.S.C. § 1361).  As set forth below, there is probable cause to believe, and I do believe, that LUIS NINO-MONCADA committed both of those offenses.

4. The facts set forth in this affidavit are based on the following: my own personal knowledge; information obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of witnesses; my review of records related to this investigation; communication with others who have knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for an arrest warrant, it does not set forth each fact that I or others have learned during this investigation.

## Applicable Law

5. Title 18, United States Code, Section 111(a)(1) makes it a federal offense to forcibly assault, resist, oppose, impede, intimidate, or interfere with any person designated in 18 U.S.C. § 1114 while that person is engaged in or on account of the performance of official duties. The statute incorporates the common-law definition of assault as (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *United States v. Dat Quoc Do*, 994 F.3d 1096, 1100 (9th Cir. 2021). Ninth Circuit model jury instruction 8.3 explains, "There is a forcible assault when one person intentionally strikes another, or willfully attempts to inflict injury on another, or intentionally threatens another coupled with an apparent ability to inflict injury on another which causes a reasonable apprehension of immediate bodily harm. Persons designated in § 1114 include any officer or employee of the United States or of any agency in any branch of the United States government while such officer or employee is engaged in or on account of the performance of official duties and any person assisting such an officer or employee in the performance of official

duties. Under § 111(a) simple assault is a misdemeanor punishable by up to one year of imprisonment, but where the assaultive acts involve physical contact with the victim, the offense is a felony punishable by imprisonment up to 8 years. Additionally, whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

6. Title 18, United States Code 1361 makes it a federal offense to willfully injure or commit any depredation against any property of the United States[1], or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United States, or any department or agency thereof, or to attempt to do so. That offense is a felony if the damage or attempted damage to such property exceeds $1,000.

**Statement of Probable Cause**

A. **Suspect Background**

7. On January 8, 2026, U.S. Border Patrol Agents were conducting targeted enforcement operations in Portland, Oregon. Border Patrol Agents target of interest was a female Venezuelan national, hereafter referred to as Adult Female 1. I learned from Immigration and Customs Enforcement (ICE) officers the following: Adult Female 1 was previously arrested by U.S. Border Patrol near El Paso, Texas, as part of a family unit on September 17, 2023, and

---

[1] Section 1361 covers property owned or leased by the United States, *United States v. Briddle*, 443 F.2d 443, 447 (8th Cir. 1971), as well as property over which the federal government "exercised dominion and control." *United States v. McCalvin*, 608 F.2d 1167, 1170 (8th Cir. 1979). *See also United States v. Komisaruk*, 885 F.2d 490, 496-97 (9th Cir. 1989) (evidence was sufficient where the government purchased the damaged property and had "the exclusive right to possess or dispose of" it).

served with a Notice to Appear and instructed to check in with Immigration and Customs Enforcement (ICE) in Portland, Oregon. Adult Female 1 never checked in with Enforcement and Removal Operations (ERO) and was eligible to be arrested and held in immigration custody.

8. According to Law Enforcement reports, Adult Female 1 is a Venezuelan national known to be involved with a Tren de Aragua (TdA) prostitution ring and believed to have been previously involved in a shooting stemming from a bad prostitution deal in Washington County on or around July 7, 2025. Law enforcement had knowledge that Adult Female 1 was associated with LUIS NINO-MONCADA (DOB: xx/xx/1992).

9. LUIS NINO-MONCADA is also known to law enforcement as a Venezuelan TdA associate and was previously ordered removed by an immigration judge in Denver, Colorado, on November 21, 2024, and is eligible for arrest and removal. Law enforcement continues to investigate the links between these subjects and TdA.

10. I have reviewed Washington County Sheriff's Office reports from events involving both LUIS NINO-MONCADA and Adult Female 1, from incidents that occurred in July and August 2025. From those reports, I learned the following: On or about July 7, 2025, Washington County Sheriff's Office (WCSO) responded to a report of shots fired in the area of SW Firlock Way. Responding deputies located and interviewed the victims, neither of whom were injured. The victims stated they had engaged the services of a prostitute, later identified by WCSO as Adult Female 1. Following a dispute with Adult Female 1, she left. Adult Female 1 later returned with several unknown males, and they started to break into the apartment. One of the victims fled out of the back of the apartment and stated he was shot at while he ran away. WCSO deputies located a single 9mm cartridge casing on the back side of the apartment.

Subsequent NIBIN testing[2] showed the casing matched casings from several other shootings, to include another shooting four days later, on July 11, 2025, in Portland, Oregon.

11.  On or around August 19, 2025, law enforcement executed a prostitution sting search warrant at an extended stay hotel in Portland and contacted Adult Female 1, who was involved in the aforementioned July 7, 2025 shooting. Law enforcement detained Adult Female 1, LUIS NINO-MONCADA, and two other males (N.P.-M. and K.D.-P.) during the search warrant. Adult Female 1 provided an interview regarding the July 7, 2025 incident. During the interview, Adult Female 1 provided several versions of events that day, but eventually admitted to her involvement in the incident. Adult Female 1 stated she had gone to the apartment two times that evening to engage in prostitution. On the second visit, one of the males forced her to provide oral sex, initially did not let her leave, and she was forced to leave without her belongings and all of her money. Adult Female 1 was able to flee and texted LUIS NINO-MONCADA to pick her up and take her back to her hotel. Once back at her hotel, Adult Female 1 called a friend named "Alex," who always carried a gun. "Alex" brought several other unknown males to the apartment to help Adult Female 1 recover her money. Adult Female 1 told investigators she led the other males to the apartment along with N.P.-M. and K.D.-P. Adult Female 1, "Alex," N.P.-M., K.D.-P., and the other unknown males went to the apartment. One of the males broke the window and Adult Female 1 stated she went inside to look for her belongings but left without recovering her belongings or money. Adult Female 1 did not mention

---

[2] NIBIN is a technology that compares shell casings and firearms to develop leads for investigators more quickly than by a forensic scientist using forensic toolmark analysis. The shell casings discussed in the affidavit will be examined by a forensic scientist, but the results have yet to be compared by an actual forensic scientist. According to the ATF, NIBIN has a 98.9% accurate confirmation rate.

hearing any shots fired.

12. LUIS NINO-MONCADA was also interviewed and admitted to regularly driving Adult Female 1. LUIS NINO-MONCADA also recalled picking up Adult Female 1 from the SW Firlock way apartment on July 7, 2025, and dropping her off at her hotel. LUIS NINO-MONCADA said he did not know anything about the subsequent shooting but described Adult Female 1 crying and having marks on her neck when he picked her up.

13. I have reviewed Portland Police Bureau (PPB) reports and spoken to investigators regarding the July 11, 2025 shooting in Portland that was connected to the July 7, 2025 shooting involving Adult Female 1. From those reports and discussions, I learned the following: On July 11, 2025, PPB responded to a call of an injury shooting in the area of NE 82nd and NE Sandy Blvd in Portland, Oregon. Officers learned the victim had been shot in the chest and was transported by private car to the hospital. Law enforcement interviewed the victim, a Venezuelan national, who sustained a gunshot to the abdomen and left arm. The victim told investigators that the shooting stemmed from an altercation with members of Tren de Aragua (TdA), whom he had associated with and purchased a car from. The victim met with a TdA member he knew by "Alex" from whom he had purchased a car. During conversation with "Alex" about getting his money back, another car arrived driven by TdA member "Leo", two unknown males, and "Camion" who the victim described as running TdA in Portland. The victim said while trying to get his money back from "Alex," one of the unknown subjects with "Leo" and "Camion," shot him one time and then fled. Law Enforcement ultimately identified "Alex" and "Camion."

14. The victim continued to cooperate with law enforcement and identified additional suspected TdA members in the Portland area. The victim identified N.P.-M. and K.D.-P. as being TdA associates and close associates of "Camion" who was running TdA in Portland. As

**Affidavit of Daniel Jeffreys** Page 6
Rev. April 2018

previously discussed, N.P.-M. and K.D.-P. were both present with LUIS NINO-MONCADA and Adult Female 1 when they were detained by WCSO during the August Prostitution Sting.

**B. January 8, 2026 - Immigration Enforcement Operation**

15. During the targeted enforcement operation on January 8, 2026, Border Patrol Agents located a red Toyota Tacoma (target vehicle) bearing Oregon license plate 521QUK, known to be associated with Adult Female 1, near Adventist Health Primary Care (SE Main/SE 100th Ave, Portland, Oregon). Border Patrol agents positively identified Adult Female 1 as the passenger of the target vehicle and LUIS NINO-MONCADA as the driver.



*Red Toyota Tacoma (target vehicle located at Bria Apartments)*

16. At approximately 2 p.m., Border Patrol agents initiated a traffic stop of the target vehicle in the parking lot of Adventist Health Primary Care using four unmarked vehicles. Six Border Patrol agents exited the vehicles. Four Border Patrol agents approached the target vehicle, and two Border Patrol agents remained near the vehicles. The Border Patrol agents identified themselves as law enforcement officers to the occupants and were wearing law enforcement identifying markings, including tactical vests and/or badges. One Border Patrol agent described the driver, LUIS NINO-MONCADA, as appearing anxious and visibly moving

around in the driver seat. Border Patrol agents gave commands for the occupants to exit the target vehicle, at which point, LUIS NINO-MONCADA placed the target vehicle in reverse, and reversed, colliding with an unoccupied Border Patrol vehicle with enough speed and force to cause significant damage. LUIS NINO-MONCADA then put the target vehicle in drive moving forward and continued the forward/reverse maneuver multiple times, striking the Border Patrol vehicle multiple times. A Border Patrol agent interviewed by FBI special agents described being fearful that LUIS NINO-MONCADA could strike them and other Border Patrol agents with the target vehicle. Another Border Patrol agent then fired their service weapon at the driver of the target vehicle. The target vehicle then fled the scene. It was unknown at the time if the shots struck either LUIS NINO-MONCADA or Adult Female 1.

17. There is no body worn camera footage from the involved six Border Patrol Agents capturing the above-described events. Investigators have scoured the area and social media in an effort to find surveillance footage, but to no avail. The fixed surveillance cameras in the area of this parking lot, according to the business, did not capture footage of this event. Investigators continue to look for any available video evidence of this event, but to date have been unsuccessful.

18. As shown in the photos below, damage to the vehicle that was rented and driven by Border Patrol agents was significant to the front bumper, resulting in the bumper being torn from the vehicle, both headlights being destroyed, the front driver-side quarter panel being dented, including the fender liner being detached, and the driver side rear-passenger door and quarter panel being dented. It is common for DHS agents, to include Border Patrol, to rent cars for authorized work during travel. This includes use during arrest and other law enforcement operations. Based on my training and experience, and conferring with other agents, I believe the

**Affidavit of Daniel Jeffreys**　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Page 8**
Rev. April 2018

damage to this vehicle exceeds $1,000.





*Damaged Border Patrol Vehicle*

19. Shortly after fleeing, the target vehicle parked in the area of the Bria apartments, NE 146th Ave, Portland. Border Patrol agents did not follow the target vehicle to this location. LUIS NINO-MONCADA called 911 shortly after fleeing and requested medical help for a gunshot wound for himself and Adult Female 1. Portland Police Bureau officers and medical personal responded to the Bria apartments to provide aid. Responding law enforcement placed a tourniquet on LUIS NINO-MONCADA. While placing the tourniquet, LUIS NINO-MONCADA repeatably stated "fuck ICE." LUIS NINO-MONCADA and Adult Female 1 were

admitted to area hospitals for treatment of gunshot wounds.

20. After receiving medical attention, LUIS NINO-MONCADA was read his *Miranda* rights and was interviewed by FBI Special Agents. In the interview, LUIS NINO-MONCADA admitted to intentionally ramming the Border Patrol vehicle in an attempt to flee, and he stated that he knew they were immigration enforcement vehicles.

## Statements

21. Thus far, FBI Special Agents interviewed four of the six Border Patrol agents who were on scene of the agent involved shooting at the time of this warrant application. Multiple interviews of Border Patrol agents not on the scene were also completed and the FBI has identified additional Border Patrol agents who will be interviewed as the investigation continues. The following is a very short summary of some of the completed interviews:

    A. Border Patrol Agent 1 (BP1) was involved in the surveillance operation to locate Adult Female 1. BP1 exited their vehicle and approached the driver side of the target vehicle with other Border Patrol agents. The Border Patrol agents were marked with law enforcement identification garments as well as verbally identified themselves as law enforcement. BP1 was in close proximity to the target vehicle when it was backing into a Border Patrol vehicle and heard two shots and saw the driver side window shatter.

    B. Border Patrol Agent 2 (BP2) was involved in the surveillance operation to locate Adult Female 1. BP2 was in the vehicle that parked behind the target vehicle. BP2 approached the driver side window. BP2 could not recall if they donned a vest with police markings or not. BP2 told the driver they were law enforcement in Spanish. BP2 backed away from the target vehicle as it was being operated in a violent manner. BP2 informed the driver to stop because a vehicle was parked behind him. After the target

vehicle rammed the Border Patrol vehicle parked behind, BP2 heard two gun shots and then saw another Border Patrol agent that was originally on the passenger side of the target vehicle was then observed in front of the driver side area of the target vehicle. BP2 was concerned for his safety and backed away from the target vehicle as it was ramming into the Border Patrol vehicle. BP2 was also concerned for the safety of nearby civilians. The adult male driver raised his hands after shots were fired but then drove away.

  C. Border Patrol Agent 3 (BP3) was involved in the surveillance operation to locate Adult Female 1. BP3 approached the driver side of the target vehicle. BP3 was marked with Law Enforcement identification garments and heard other Border Patrol agents identify themselves as law enforcement. BP3 was located on the driver side of the target vehicle between the cab and bed of the target vehicle. Once the target vehicle began ramming the Border Patrol vehicle parked behind the target vehicle, BP3 was fearful for their safety and for the safety of other Border Patrol agents. This was due to the proximity of BP3 to the target vehicle and the target vehicle moving fast and striking the Border Patrol vehicle with force like the driver had floored the gas pedal.

  D. Border Patrol Agent 4 (BP4) was involved in the surveillance operation to locate Adult Female 1. BP4 was parked at the third car parked behind the Border Patrol vehicle that was stuck by the target vehicle. By the time BP4 exited their vehicle, they heard another Border Patrol agent inform the driver that a vehicle was parked behind the target vehicle. The target vehicle then violently rammed into the Border Patrol vehicle parked behind the target vehicle multiple times. Given the conduct by the driver, BP4 drew their service weapon but held it in "sul," meaning, aimed towards the ground. BP4 observed another Border Patrol agent who was near the front driver side of the target

vehicle fire two rounds from their service pistol into the driver's side window. That Border Patrol agent had been standing in front of the target vehicle during the ramming, but had moved towards the driver's side of the target vehicle. Because of the distance between BP4 and the target vehicle, BP4 was not in fear for his own life.

  E. Border Patrol Agent Team Leader (BPTL) was not involved in the surveillance operation to locate Adult Female 1. BPTL was not involved or on the scene of the agent involved shooting; they did not witness what happened. BPTL was a team leader to the agents, and they arrived on scene after the fact and spoke with some of the involved Law Enforcement Officers. BPTL reported to the FBI BPTL's understanding of the operation, based on what BPTL had heard on scene. BPTL said they heard that six agents approached the target vehicle, identified themselves as federal law enforcement and ordered the occupants out of the car. BPTL said BPTL heard that the male driver attempted to drive into one of the Border Patrol agents and that one of those agents reported to him that a team member got out of the way and shot multiple times at the driver during the operation.

  22. On or around January 10, 2026, FBI agents interviewed the registered owner of the target vehicle who is identified herein as Adult Male 1. The target vehicle is financed by Adult Male 1 who is associated with Adult Female 1. The two have been friends for approximately one year. Back in or around September 2025, Adult Female 1 asked Adult Male 1 to sign for the target vehicle at a dealership, with the promise that Adult Female 1 would make all the payments. Adult Female 1 took possession of the target vehicle at the dealership on or around September 2025. Adult Female 1 made the promised payments to Adult Male 1 for the use of the target vehicle.

## Conclusion

23. Based on the foregoing, I have probable cause to believe, and I do believe, that LUIS NINO-MONCADA committed the federal offense of Aggravated Assault on a Federal Officer (18 U.S.C. §§ 111(a) and 111(b)) and Depredation of Government Property (18 U.S.C. § 1361) by using the vehicle as a weapon, driving back and forth in a forceful manner, in an attempt to cause harm to Border Patrol Agents on scene and striking a Border Patrol vehicle before fleeing the scene. This conduct led to Law Enforcement Officers to experience a reasonable apprehension of bodily harm. I therefore request that the Court issue a criminal complaint and arrest warrant for LUIS NINO-MONCADA.

24. Prior to being submitted to the Court, this affidavit, the accompanying complaint and the arrest warrant were all reviewed by an Assistant United States Attorney (AUSA) Leah K. Bolstad, and AUSA Bolstad advised me that in her opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed. R. Crim. P. 4.1*
DANIEL JEFFREYS
SPECIAL AGENT, FBI – PORTLAND

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at __4:55 pm__ on January __10__, 2026.

_____
HONORABLE JOLIE A. RUSSO
United States Magistrate Judge
