Michael Benson, AK Bar No. 1311070  
Assistant Federal Public Defender  
Email: Michael_Benson@fd.org  
Peyton Lee, OSB No. 164224  
Assistant Federal Public Defender  
E-mail: Peyton_Lee@fd.org  
101 S.W. Main Street, Suite 1700  
Portland, OR 97204  
Tel. (503) 326-2123  

Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:26-cr-00007-IM-1 |
| Plaintiff, | |
| v. | MOTION FOR PRETRIAL RELEASE |
| LUIS NIÑO-MONCADA, | |
| Defendant. | |

Defendant, Luis Niño-Moncada through counsel, Michael Charles Benson and Peyton Lee, respectfully request his release from custody pending trial pursuant to the Bail Reform Act.

**PROCEDURAL HISTORY**

Luis Niño-Moncada will appear January 21, 2026, to address his continued detention in this matter. Mr. Niño-Moncada made his first appearance in federal court on January 12, 2026, and asked the court to return at a later date when he could submit an appropriate plan for release. Mr. Niño-Moncada has been charged by indictment with one count of assault on a government

Page 1   MOTION FOR PRETRIAL RELEASE

employee under 18 U.S.C. § 111 and one count of depredation of government property under 18 U.S.C. § 1361. Both charges are based on an incident that occurred on January 8, 2026, where a Border Patrol Agent shot Mr. Niño-Moncada and his passenger while they were inside their vehicle in a hospital parking lot. Because Mr. Niño-Moncada has not previously addressed release, the detention order in this case has been issued without prejudice.

I.      Legal Standard

The Bail Reform Act is supposed to be a statute of release: "Only in rare circumstances should release be denied, and doubt regarding the propriety of release should be resolved" in Mr. Niño-Moncada's favor. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir 1991). Doubts about whether bail "should be granted or denied should always be resolved in favor of the defendant." *Herzog v. United States*, 75 S. Ct. 349, 351 (1955). The structure of the statute reflects the overarching goal of release on recognizance or conditional release pending trial. The statute allows the court to release a defendant on his or her own recognizance or under conditions of release. 18 U.S.C. § 3142(a)(1) & (2). When releasing a defendant, the Court is only authorized to impose the "least restrictive further conditions, or combination of conditions," that reasonably assure appearance in court and community safety. 18 U.S.C. § 3142(c)(B).

Although there is a rebuttable presumption in this case, that presumption merely shifts a burden of production to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). However, "[t]he defendant's burden of production is not heavy." *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991). He need only produce "some evidence." *Id.* The "burden of persuasion regarding risk-of-flight and danger to the community always remains with the government." *Id.* at 1354-55.

## II.     Mr. Niño-Moncada's release plan, serious injuries, and character

Mr. Niño-Moncada has an ideal release plan. He intends to be released to a home where he would have his own room. The individuals at that address can take care of his basic needs, including food and transportation to court. They are pro-social individuals with Spanish skills along with a history of working with people from difference cultures. They also have basic medical training and can help with basic wound care.

Mr. Niño-Moncada is seriously injured. In court he has been unable to place headphones on his head without assistance. He is in tremendous pain from his wounds. Mr. Niño-Moncada's reduced mobility and his need to regularly attend medical appointments should cut against any suggestion that he might flee. Mr. Niño-Moncada will also value his pre-trial release more than the typical defendant because of the severe difficulty of receiving medical treatment for a gunshot wound while incarcerated.

Mr. Niño-Moncada has no prior criminal convictions. He has lived in the United States for approximately three years. He came to the United States for the "right reasons," looking for a better life. Ex. A. Mr. Niño-Moncada was part of a large extended family in Venezuela and was not a trouble maker or a member of any gang. Ex. A. The complaint documents multiple instances where Mr. Niño-Moncada has been cooperative with law enforcement, including when being interviewed in connection with an investigation. In this case, shortly after Mr. Niño-Moncada was shot he reached out to law enforcement through a call to 911 and there is no indication he was uncooperative with the Portland Police Bureau officers who responded.

When Mr. Niño-Moncada has been a party to court proceedings, he has abided by the orders of the court and respected the legal process. Mr. Niño-Moncada's only other contact with the criminal justice system in the approximately three years he has lived in the United States is a

misdemeanor DUI in Washington County case 25CR62302. In that case, Mr. Niño-Moncada was released. He proceeded to follow his conditions of release and appeared in court when he was ordered to. He appeared when ordered to despite the fear any individual without legal status would have appearing in court.

The Pre-Trial Risk Assessment (PTRA) for Mr. Niño-Moncada assesses his chances of success on release at 90%. As will be discussed in part III pre-trial's assessment also credits the assertion based on very little evidence that Mr. Niño-Moncada is an "associate" of a gang. What is more the PTRA overstates the risk for Hispanic defendants. Thomas H. Cohen & Christopher Lowenkamp, *Revalidation of the Federal PTRA: Testing the PTRA for Predictive Biases*, 46 Crim. J. & Behavior 234, 251 fig 2. The available evidence suggests that Mr. Niño-Moncada presents a strong likelihood of appearance and low risk of violating his release conditions.

### III.	The weight of the evidence, the circumstances of the offense and the argument that Mr. Niño-Moncada is an "associate" of a gang

The government's case for assault, at least on the face of the complaint, is not particularly strong. The circumstances of this offense when considered in full context do not indicate that Mr. Niño-Moncada is a risk of flight or a danger to the community. The evidence that Mr. Niño-Moncada is an "associate" of a gang is minimal. These issues simply do not support detaining Mr. Niño-Moncada despite his strong likelihood of success of pre-trial release.

#### A.	There are significant questions regarding the evidence underlying the assault charge which triggers the presumption.

Mr. Niño-Moncada previously submitted briefing regarding the legal standard for assault as charged in this case. Pretrial Memorandum ECF #7. In short, to sustain the assault charge that triggers the presumption in this case, the government must show either that Mr. Niño-Moncada willfully attempted to hit a federal agent with his car and intentionally used his car as a weapon

in doing so or that Mr. Niño-Moncada intentionally assaulted a federal agent, placing that agent in reasonable fear that they would be imminently injured by his car and intentionally used his car as a weapon in doing so. A paradigmatic example of what is not an assault is recklessly using a motor vehicle in a manner that is frightening without an intent to assault. *Id* at 3-4. Given the facts in this case there is a significant question of whether Mr. Niño-Moncada had any intent to assault or whether he was merely trying to flee. What is more, the complaint fails to even allege a specific individual who either (a) believed they were about the be hit by the vehicle or (b) Mr. Niño-Moncada intended to hit and missed.

      **B.    The circumstances of this case when considered in context do not strongly show a risk of flight or danger to the community.**

This court should not draw any strong inference from Mr. Niño-Moncada's alleged actions in this case that he will fail to appear for court. The stop in this case occurred just a day after the highly publicized shooting of Renee Good in Minneapolis. Video reconstruction and news reports suggest that Ms. Good was shot by a border patrol agent absent any good cause,[1] and that border patrol agents prevented her from receiving medical care from a doctor at the scene.[2] This extremely high-profile shooting occurred on the heels of many other extensively reported aggressive actions by immigration agents ranging from breaking car windows during vehicle stops to other shootings, including a Chicago shooting where agents shot a woman five

---

[1] https://news.wttw.com/2026/01/09/minnesota-shooting-videos-challenge-administration-narrative-policing-experts-question

[2] https://www.theguardian.com/us-news/2026/jan/09/federal-officers-blocked-medics-from-scene-of-ice-shooting-witnesses-say

times and later bragged about it in text messages.[3] Recent reporting indicates that Border Patrol agents have shot eleven individuals during immigration enforcement just since September, many of them in their vehicles.[4]

The point is not simply that Border Patrol has used extremely aggressive and controversial tactics, but that these tactics and the widespread reporting about them are creating a climate of abject terror in the immigrant community. Mr. Niño-Moncada has prior experiences with assaultive and illegal conduct by law enforcement that likely made him more apt to be frightened in that situation. Ex. A. The decision to generally have agents wear tactical gear, cover their faces with masks, and drive unmarked vehicles does little to assuage that fear.[5] Just as terrifying for someone in Mr. Niño-Moncada's position is the aggressive language the Department of Homeland Security has consistently used to defend these shootings. The position of the Department of Homeland Security has not been that these incidents reflect variances from training or unfortunate momentary lapses in judgment; instead, it has indicated that its officers who shoot into vehicles are behaving as they should.[6] Anyone who looks like Mr. Niño-Moncada would wonder: if shooting someone who looks like Ms. Good is acceptable what can they do to someone who looks like me?

---

[3] https://news.wttw.com/2025/11/20/feds-dismiss-charges-against-woman-shot-border-patrol-agent-brighton-park

[4] https://www.nbcnews.com/news/us-news/ice-shootings-list-border-patrol-trump-immigration-operations-rcna254202

[5] https://www.opb.org/article/2025/07/10/masked-and-unmarked-the-quiet-rise-of-concealed-immigration-raids/

[6] https://www.pbs.org/newshour/politics/watch-live-noem-holds-news-conference-in-minneapolis-after-fatal-ice-shooting-of-woman

The idea that Mr. Niño-Moncada should be viewed as likely to evade his court appearances because of the allegations in this case rests on a conflation of two very different things. Whether Mr. Niño-Moncada tried to run when aggressively approached by at least six Border Patrol agents who boxed him in in unmarked vehicles while he was taking his partner to a medical appointment simply does not bear on the question of whether he will show up to court when ordered. One decision is made in abject terror in tenths of a second. The other is made with time, the advice of counsel, and the assistance of pre-trial services. There is simply no reason to believe Mr. Niño-Moncada would make the same choices in those different situations.

### C. The evidence does not support any inference that Mr. Niño-Moncada is in Tren de Aragua.

The complaint discusses at length that notion that Mr. Niño-Moncada is an "associate" of Tren de Aragua. The complaint does not explain what an "associate" of Tren de Aragua is. The evidence supporting this contention is minimal.

Essentially, the allegation is that the passenger in Mr. Niño-Moncada's vehicle engages in sex work. While working engaged in sex work, she was raped and robbed. She says that after she was attacked, Mr. Niño-Moncada picked her up. Mr. Niño-Moncada was interviewed, talked to police, confirmed she'd been assaulted, and indicated she was crying and had red marks on her neck when he picked her up. She called another individual named "Alex," because he (apparently unlike Mr. Niño-Moncada) had a gun. She went with "Alex" and some other men, none of whom were Mr. Niño-Moncada, to get her property back. One of those other men may or may not have discharged a firearm during the ensuing altercation.

When Mr. Niño-Moncada was questioned about this incident he was at the same hotel as two other people. Those people were allegedly involved in another shooting that has no

relationship to Mr. Niño-Moncada at all. The victim in that case claims those two men belong to Tren de Aragua and possibly that someone named "Alex" is also a member.

To summarize: the evidence that Mr. Niño-Moncada is an "associate" (whatever that undefined term may mean) of Tren de Aragua is that he was in a room with two people on one occasion, and those two people are accused of being in that gang. The same information, if credited, would indicate that Mr. Niño-Moncada does not have access to a gun or is unwilling to use one. It would also indicate that when the passenger was raped and robbed she felt the need to call someone else named "Alex" and not Mr. Niño-Moncada to recover her property. Mr. Niño-Moncada spoke with law enforcement. He spoke with them honestly, and corroborated key information regarding the sexual assault and robbery. On balance, this information is flatly inconsistent with the notion that Mr. Niño-Moncada is a member of Tren de Aragua or any other gang.

## CONCLUSION

The government cannot meet its burden of proving that no condition or combination of conditions exists that can reasonably assure the safety of the community and that Mr. Niño-Moncada will appear for court. Mr. Niño-Moncada requests that the court release him subject to the least restrictive combination of conditions that the court deems necessary. 18 U.S.C. § 3142(c)(1)(B).

Dated: January 20, 2026.

*/s/ Michael Benson*
Michael Benson, AK Bar No. 1311070

*/s/ Peyton Lee*
Peyton Lee, OSB No. 164224