SCOTT BRADFORD, OSB #062824
United States Attorney
District of Oregon
**THOMAS H. EDMONDS, OSB #902555**
Tom.Edmonds@usdoj.gov
**LEAH K. BOLSTAD, OSB #052039**
Leah.Bolstad@usdoj.gov
Assistant United States Attorneys
1000 S.W. Third Ave., Suite 600
Portland, Oregon 97204
Telephone: (503) 727-1000
Attorney for United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:26-cr-00007-IM |
| v. | GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION |
| LUIS NINO-MONCADA, | |
| Defendant. | |

When approached by federal law enforcement agents engaged in an immigration enforcement operation, defendant Luis Nino-Moncado used an over-4000 pound Toyota Tacoma pickup truck to strike an agent and violently rammed into a government vehicle multiple times, fighting the agents' efforts to apprehend him and his passenger, and succeeded in getting away. Defendant is illegally present in the United States and an Immigration Judge issued a final order of removal against him in November 2024. Rather than submit to commands to exit the vehicle, defendant put the officers in grave danger by ramming his way out of a crowded parking lot. In maneuvering his heavy, lifted pickup truck, defendant struck one of the officers with the front

**Govt Memorandum in Support of Pretrial Detention** Page 1

end of the vehicle and drove his pickup directly towards that agent, putting him in immediate fear for his life. That agent fired at defendant who nevertheless succeeded in ramming his way out of the parking lot, fleeing the scene. A federal magistrate judge found defendant's actions constituted felonious aggravated assault with a deadly or dangerous weapon and depredation of government property when presented with a Complaint. Then, a federal grand jury returned an indictment for both of those charges. Defendant's extreme flight risk and danger are manifest in the conduct determined in both of those findings and the evidence discussed below. This Court should order him detained as both a danger to the community and a risk of flight.

## BACKGROUND

### A.    Procedural History

On January 10, 2026, a criminal complaint was presented to and signed in the District of Oregon by U.S. Magistrate Judge Jolie A. Russo, in Case No. 26-mj-00004.[1] The complaint charged him with Aggravated Assault on a Federal Law Enforcement Officer with a Deadly or Dangerous Weapon (18 U.S.C. §§ 111(a), 111(b)) and Depredation of Government Property (18 U.S.C. § 1361). A subsequent arrest warrant for Luis Nino-Moncada for those two offenses was issued. Defendant made his initial appearance on Monday January 12, 2026, and the court arraigned him on the complaint. The matter of detention was continued.

On Tuesday January 13, 2026, the grand jury returned a 2-count indictment charging defendant with Aggravated Assault on a Federal Law Enforcement Officer with a Deadly or Dangerous Weapon (18 U.S.C. §§ 111(a), 111(b)) and Depredation of Government Property (18

---

[1] The Complaint's supporting affidavit, and the Complaint itself, are incorporated herein by reference, but because the Complaint was signed within 48 hours of the incident, not all of the significant witnesses had been interviewed at that point and this memorandum proffers facts beyond that affidavit's contents.

U.S.C. § 1361). On Wednesday January 14, 2026, the court arraigned defendant on his indictment, he pleaded not guilty, and defendant requested additional time to prepare for a detention hearing. The detention hearing is scheduled for January 21, 2026.

B.   Facts

Luis Nino-Moncado is a native and citizen of Venezuela. He illegally entered the United States on or about October 3, 2022, at or near Paso Del Norte, Texas. On March 1, 2023, he was arrested at or near Denver, Colorado, where he was living at the time, and committed to removal proceedings. He was released after being personally served with a Notice to Appear to an immigration hearing before an Immigration Judge. Defendant signed the Notice to Appear, which instructed him to appear on November 21, 2024, at a Denver court address. Luis Nino-Moncado failed to appear for that immigration hearing. The Immigration Judge ordered his removal from the United States in a Final Order that same day. Due to that Order, Nino-Moncada was subject to arrest and removal.

During a targeted enforcement operation that occurred on January 7 and 8, 2026, United States Border Patrol agents surveilled a location associated with Adult Female 1. On January 8, 2026, at approximately 1:30 p.m., a Border Patrol agent located a red Toyota Tacoma (target vehicle, pictured below), known to be associated with Adult Female 1. Eventually, they observed the target vehicle traveling near Adventist Health Primary Care (SE Main/SE 100th Ave, Portland, Oregon). Border Patrol agents positively identified Adult Female 1 as the passenger of the target vehicle and defendant Luis Nino-Moncado as the driver.

/ / / /

/ / /

/ / / /



*Red Toyota Tacoma (target vehicle located at Bria Apartments, after the assault)*

All of the agents had been briefed about both occupants before the operation began. The agents were briefed that Adult Female 1 was involved in a Tren de Aragua gang (TdA)-associated prostitution ring, which had additional connection to a suspected TdA-related shooting incident earlier in mid-2025. The briefing included identification of Luis Nino-Moncado as an associate of Adult Female 1, his own associations with TdA, and that he was a possible shooter from the earlier incident.

At approximately 2:15 p.m., Border Patrol agents initiated a traffic stop of a Toyota Tacoma pickup truck, after it parked in the lot of Adventist Health Primary Care, using four unmarked government vehicles. One of the government vehicles, a Hyundai sedan, was parked directly behind the Tacoma, with the driver's side of the Hyundai perpendicular to the rear of the Tacoma at a distance of approximately five feet. The remaining government vehicles were either behind the Hyundai's passenger side or in nearby areas of the parking lot.

Six Border Patrol agents exited their vehicles. Four Border Patrol agents approached the target vehicle, and two Border Patrol agents remained near their vehicles. Of the four agents who approached, one, Border Patrol Agent-5 (BP-5), went to the passenger side of the vehicle

and stood just outside the Tacoma's front passenger window. The other three approached the driver's side with one of the officers, BP-2, standing directly outside the driver's window. All four agents identified themselves as law enforcement officers to the occupants and were wearing law enforcement identifying markings, including tactical vests and/or badges.

BP-5, at the passenger's window, yelled at both occupants in Spanish and English to get out of the vehicle. He repeated these commands several times. BP-5 was able to identify both occupants as those on which the agents had been briefed. He saw Adult Female 1 shake her head "no" to his commands to get out of the vehicle and also saw her try to manually lock her door.

Agents on a driver's side also issued similar oral commands. BP-5 saw defendant appear unsure about what he would do, looking ahead for approximately 15-30 seconds while the officers were loudly giving commands. Another agent described the driver, Luis Nino-Moncado, as appearing anxious and visibly moving around in the driver seat. Agents on the driver's side shouted that there was a car behind him and BP-1 attempted to break the driver's side window after the many seconds of non-compliance.

BP-5, still at the passenger's window, then saw defendant put the truck in gear. He saw and heard the truck back up aggressively. Due to the truck turning as it backed up, the front right end of the truck moved across towards BP-5 and struck him in the left part of his chest as the angle of the truck changed. BP-5 saw and heard the Tacoma's engine rev and the truck slam into BP-5's government Hyundai behind the truck. The angle of the truck continued to change when defendant again revved the truck forward. BP-5 was now directly in front of the forward-moving truck due to the changing angle. BP-5 moved across the oncoming truck's path and retrieved his weapon from its holster, while still in front of the oncoming vehicle. Out of fear for his life, BP-5 fired two rounds into the driver's side window.

The truck continued to move and violently backed up again, making more contact with the Hyundai and screaming forward, now parallel with the Hyundai's driver's side. One agent described defendant as "flooring" the gas pedal. Another described the ramming as "violent." As it then drove forward again, defendant's Tacoma made contact along the length of the Hyundai and ripped the front end bumper off before driving away. As shown in the photos below, damage to the Border Patrol vehicle was significant to the front bumper, resulting in the bumper being torn from the vehicle, both headlights being destroyed, the front driver-side quarter panel being dented, including the fender liner being detached, and the driver side rear-passenger door and quarter panel being dented. The debris field that resulted from this repeated ramming demonstrated how forceful these collisions were. Photos of damaged Border Patrol Vehicle:



/ / / /

/ / / /

/ / / /

/ / / /

/ / / /



On the night of the incident, defendant made statements in the presence of the Portland Police and the FBI. To the police, he acknowledged that the officers who had tried to arrest him were ICE officers. To the FBI, after advice of *Miranda* rights, defendant admitted to intentionally ramming the Border Patrol vehicle in an attempt to flee, and he stated that he knew they were Immigration Enforcement vehicles.

The Toyota Tacoma, used as a weapon in the assault and damage to the government car, has a Curb Weight of 4,315 pounds, a 3.5-liter V6 engine with 278hp, and the truck had an approximate 2-3-inch lift kit installed. The point where the hood opens at the front of the truck is 50 inches above the ground. The fulcrum of the hood as it rises towards the windshield is 54.5 inches above the ground. A photo of the front end of the Tacoma:

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /



The Tacoma was modified with installation of running boards, which on both sides had metal "Predator Tube Steps," used to climb into the lifted vehicle. On the passenger side of the Tacoma, which made contact across the length of the driver's side of the Hyundai, the tube steps (2) were both completely shorn off by defendant's actions.

## APPLICABLE LAW

This case is eligible for a detention hearing and order pursuant to 18 U.S.C. § 3142(f)(1) because defendant is charged with a crime of violence - Aggravated Assault on a Federal Law Enforcement Officer with a Deadly or Dangerous Weapon. The Ninth Circuit has held that a defendant charged with assault by using a deadly or dangerous weapon in violation of 18 U.S.C. § 111(b) must necessarily threaten the use of force, thus qualifying it as a "crime of violence." *United States v. Juvenile Female*, 566 F.3d 943, 947–48 (2009).

The Federal Rules of Evidence do not apply in detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F. Supp. 2d 925, 925, 26 (N.D. Cal. 2007).

Under the governing bail statute, 18 U.S.C. § 3142, the government bears the burden of proving by a preponderance of the evidence that a defendant is a flight risk; and community danger requires clear and convincing proof. *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). Four factors help guide release decisions: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the nature and seriousness of the danger posed to the community; and (4) defendant's history and characteristics. 18 U.S.C. § 3142(g).

The Bail Reform Act provides that defendants shall be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

## DISCUSSION

Defendant Nino-Moncada poses a significant danger to the community and a very significant risk of flight. The facts in this case clearly demonstrate flight from law enforcement efforts to apprehend defendant and his passenger Adult Female 1, and also clearly present that such flight was inherently dangerous to law enforcement and the public. There truly can be no greater demonstration of risk of flight and danger when it relates to future apprehension than in this case. It is inherent to the charged and indicted offenses. Past is prologue and should law enforcement have to apprehend defendant in the future they would face a demonstrated and known resistance. This Court should order detention, accordingly.

### A. Nature and Circumstances of the Offense and Weight of Evidence

The facts demonstrate that defendant clearly and intentionally decided to flee from arresting officers. He considered for 15-30 seconds his situation and, rather than complying with the lawful commands of multiple law enforcement officers, chose to fight his way out using his truck as a weapon and means of escape. His intentional employment of the over-4000 pound truck as a deadly and dangerous weapon was completely within his control and intentional actions. Those actions were intended to and caused the vehicle to strike another and threatened another coupled with an apparent ability to inflict injury on another, which caused a reasonable apprehension of immediate bodily harm to that person. *See* Ninth Circuit Model Criminal Jury Instruction 8.2, Assault on Federal Officer or Employee With a Deadly or Dangerous Weapon (18 U.S.C. § 111(b) (defining forcible assault)). All of the defendant's actions in exclusively controlling the Tacoma put all of the officers in danger, but particularly BP-5 who was struck by the truck and who was directly in front of its forward movement and change in angle, completely controlled and caused by the defendant's maneuvering forward and to that angle. The size and nimbleness of the weapon he used made it a potent to strike/threaten the officers and affect his flight. The weight of the evidence is strong, with the statements of six officers and the corroborative damage to the Hyundai as clear demonstration of the results of defendant's actions.

The first factor—the nature and circumstances of the offense charged—contemplates not only the specific acts and charges that are alleged, but also the potential penalty that may be imposed if the person is convicted. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). Defendant's current charge carries a substantial twenty-year maximum sentence as well as significant exposure under the sentencing guidelines. If convicted after a trial, defendant would face several years of

**Govt Memorandum in Support of Pretrial Detention**                                                            **Page 10**

imprisonment. Further, a conviction in this matter would likely bar future legal immigration efforts and creates an additional incentive to avoid being held accountable here.

### B. Nature and Seriousness of the Danger Posed to the Community

Of course, defendant poses a danger to the community. The case facts all discussed above, alone, give rise to credible evidence that defendant will take the step with violent action to achieve a purpose. Release to the community would simply create a high risk of future danger to officers and public safety.

### C. Risk of Flight

The arguments already presented above concerning the facts and circumstances of this case overwhelmingly meet the preponderance of evidence standard for finding a risk of flight.

Flight in this case is not a theoretical risk, as it can be in many cases, either. When agents attempted to arrest defendant, he reacted violently and dangerously while driving a very potent weapon. From such facts, this Court cannot draw confidence about defendant abiding by conditions or following directions from pretrial officers.

### D. Defendant's History and Characteristics

Defendant may resort to arguing that he does not have an established criminal history, but that would not give this Court a basis to release on the flight and danger evidence presented, nor does it give a full picture of his background, which does not support release. There are several important aspects to such concerns:

(1) He entered the United States illegally, failed to appear for a hearing he was given full notice of, and has never complied with immigration requirements.

(2) Since coming to Oregon sometime after March of 2023, he has been involved in criminal activity. He has assisted and been a driver for Adult Female 1, in her

regularly conducted prostitution business, which, among other things, financed the payments for the relatively new Toyota Tacoma used in this case. In the summer of 2025, he was associated with a shooting incident that arose out of a dispute Adult Female 1 had with a customer, or customers, where she alleged they had stolen money from her and forced her into sexual activity. In the aftermath of her dispute, defendant picked her up and drove her away, and she then brought in associates believed to be TdA gang members who retaliated against the customers with gunfire.

(3) On November 5, 2025, Beaverton Police arrested defendant for Unauthorized Use of a Motor Vehicle and Driving Under the Influence of Intoxicants.

(4) His traffic record is extraordinary and shows a complete disregard for the law:

   a. April 2, 2025, convictions for driving without a license, speeding (73 in a 55 mph zone);

   b. April 7, 2025, conviction for speeding (41 in a 30)

   c. May 14, 2025, convictions for failure to obey a traffic control device and speeding (41 in a 30);

   d. May 16, 2025, conviction for speeding (44 in a 30);

   e. June 26, 2025, conviction for speeding (47 in a 30);

   f. August 6, 2025, conviction for failure to obey a traffic control device;

   g. August 7, 2025, his license was suspended for failure to appear;

   h. September 10, 2025, convictions for speeding (86 in a 55); driving without a valid license, driving uninsured, Careless Driving; failure to provide proof of insurance.

That background presents a person who will repeatedly violate the law with impunity, many of these violations within days of each other. On eight occasions, with often multiple violations in each instance, defendant broke basic traffic laws. He cannot be relied on to follow conditions of release in a serious criminal case in which the consequences for failure are so high and the portent of danger to officers and the public even higher.

## CONCLUSION

Defendant's risk of nonappearance and danger to the community compel his detention pending trial. For the reasons state above, the government respectfully moves this Court to detain him as a risk of flight and danger to the community.

Dated January 21, 2026                Respectfully submitted,

                                      SCOTT BRADFORD
                                      United States Attorney

                                      /s/ *Thomas H. Edmonds*
                                      THOMAS H. EDMONDS, OSB #902555
                                      LEAH K. BOLSTAD, OSB #052039
                                      Assistant United States Attorneys