Michael Benson, AK Bar No. 1311070
Assistant Federal Public Defender
Email: Michael_Benson@fd.org
Peyton Lee, OSB No. 164224
Assistant Federal Public Defender
E-mail: Peyton_Lee@fd.org
101 S.W. Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>LUIS NIÑO-MONCADA,<br>Defendant. | Case No. 3:26-cr-00007-IM<br>SENTENCING MEMORANDUM |

The defendant, Luis Niño-Moncada, through counsel, Michael Charles Benson and Peyton Lee, submits this Memorandum for the Court's review and consideration in determining a reasonable sentence that is "sufficient, but not greater than necessary," as required by 18 U.S.C. § 3553(a). A sentencing hearing is currently scheduled for September 16, 2026.

On July 27, 2026, Mr. Niño-Moncada pleaded guilty to Depredation of Federal Property, in violation of 18 U.S.C. § 1361. He has reviewed the Presentence Investigation Report ("PSR")

with defense counsel and has no unresolved objections as to the applicable guidelines range. Mr. Niño-Moncada's final adjusted offense level is 12, and he has no criminal convictions leading to a guideline sentencing recommendation of between 10 and 16 months. The parties and probation recommend a downward variance to a sentence of time served in this matter.

### A. Mr. Niño-Moncada grew up as a promising student, raised by a large, extended and successful family network in Venezuela.

Mr. Niño-Moncada was unable to rely on either of his parents while he was growing up. His father left when he was very young and was unavailable during his childhood. PSR ¶ 68. Mr. Niño-Moncada lost his mother more slowly as her mental and physical health deteriorated over time. PSR ¶ 68. While Mr. Niño-Moncada has remained extremely close to his mother throughout his life, she has not been able to be a support for him. Ex. A. Instead, Mr. Niño-Moncada has had to support his mother, who is unable to take care of herself. Ex. A.

Even though Mr. Niño-Moncada did not have consistent support from his biological parents, he grew up experiencing care, support, and love through his close extended family. Ex. A; PSR ¶ 69. He was raised primarily by his uncle and his maternal grandmother who provided him with a childhood he still remembers fondly. PSR ¶¶ 69, 72. Mr. Niño-Moncada's experience of support and love as a child is evident in his personality today. He is a warm and outgoing man who easily makes friends. His outgoing and gregarious nature is evident in photographs from his youth:




His brother notes his outgoing personality, with interests in sporting events and dancing. Ex. A. His cousin notes that Mr. Niño-Moncada went to the United State for the "right reasons," wanting to work for a better life. Ex. B. Mr. Niño-Moncada is extremely concerned for the wellbeing of his family, particularly his mother who has needed considerable care throughout his adult life.

Mr. Niño-Moncada's family members are hard-working, educated and successful people. When Mr. Niño-Moncada was young the Venezuelan economy was strong due to the high price of oil particularly before 2014. His family used this opportunity to attend university. His brothers received degrees in engineering and business management, and his cousin is a professional in Argentina. Ex. A. Mr. Niño-Moncada, always a good student, also attempted to attend university, studying criminal justice.

### B. Political violence and economic catastrophe in Venezuela ended Mr. Niño-Moncada's university education and led him to immigrate to the United States.

Changes within Venezuela starting in 2013 created extreme difficulties for Mr. Niño-Moncada. The Venezuelan economy contracted every year from 2014 through 2020 and by 2020 per capita GDP was less than a third of what it had been in 2014.[1] Mr. Niño-Moncada's cousin recalls that essential goods like food were rationed and only available to purchase once a week. Ex. B. This economic catastrophe went hand in hand with the rise of a brutally repressive authoritarian regime. Nicolas Maduro, elected by a slender majority in 2013, used executive power and influence over the courts to effectively nullify the opposition party's control of the National Assembly in 2015 and cancel elections in 2016. A 2022 Human Rights Report from the U.S. Department of State notes that Maduro's regime continued to hold power through means varying from manipulation of the political process to arbitrary killings. U.S. Department of State, *Venezuela 2022 Human Rights Report*, at 2, 34.[2]

By the time Mr. Niño-Moncada was university age, the situation had gotten so bad that it was difficult to receive an education. The university was unable to consistently function due in part to COVID. This had been part of a longer pattern where universities were forced to open and close without notice. Ex. B. The Maduro regime targeted universities seeking to punish hostile

---

[1] *See* World Bank Data (available at https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=VE); International Monetary Fund Data (available at https://www.imf.org/external/datamapper/NGDPDPC@WEO/VEN?zoom=VEN&highlight=VEN).

[2] Available at https://www.state.gov/wp-content/uploads/2023/02/415610_VENEZUELA-2022-HUMAN-RIGHTS-REPORT.pdf.

academics and control the allocation of scholarships. U.S. Department of State, *Venezuela 2022 Human Rights Report*, at 28-29.

Mr. Niño-Moncada personally experienced political violence. While attending protests he was abducted by government affiliated forces. PSR ¶ 75. He was personally tortured by means of waterboarding and hanging.[3] PSR ¶ 75. He also had to watch other individuals being brutally treated, including an incident where guards encouraged a rat to attack a detainee. PSR ¶ 75. Mr. Niño-Moncada was aware that other protestors had been tortured and even murdered as retaliation for opposing the regime. PSR ¶ 76.

These incidents led Mr. Niño-Moncada to flee Venezuela to come to the United States. He was not alone. An incredible number of refugees have fled Venezuela since 2013. Venezuelan refugees have not been limited to individuals facing desperate personal financial situations. Instead, educated and upwardly mobile Venezuelans—that is to say people who would have a lot in common with Mr. Niño-Moncada—have fled at such a rapid rate that there has been fear of a "brain drain" within Venezuela. *See*, *e.g.*, *Venezuela's Rebuild Exposes a Decade of Brain Drain,* Rio Times, July 16, 2026.[4]

Mr. Niño-Moncada elected to make the arduous journey, partially on foot, through Central America and Mexico to the United States. PSR ¶ 77. He entered at the Paso Del Norte Bridge in El Paso, Texas. This is an established and extremely busy border crossing on a bridge

---

[3] The "hanging" was likely a form of stress position torture. *See* Darius M. Rejali, *Torture and Democracy*, 316-33 (4th Ed. 2009) (discussing immobilization torture techniques and charting their history).

[4] Available at https://www.riotimesonline.com/venezuela-reconstruction-brain-drain-skilled-workers/.

that crosses the Rio Grande River between Juarez Mexico and El Paso Texas. Immigration authorities detained him within ten minutes of his open crossing. PSR ¶ 77. He was then released into the United States and gained temporary status, including the right to work. PSR ¶ 78. At first, he lived in Denver. He worked picking up trash at a football stadium, then later as a delivery driver, and doing duct work. PSR ¶ 99-103.

Mr. Niño-Moncada relocated from Denver to Seattle and duly informed immigration authorities of his move. PSR ¶ 77-78. He was scheduled to have a hearing in Seattle in November of 2024. PSR ¶ 78. If Mr. Niño-Moncada had attended this hearing, he would have likely been able to remain and work lawfully in the United States as Temporary Protected Status for Venezuelans had been extended through September of 2025. However, hearing rumors of "ICE presence" in Denver following the 2024 election, Mr. Niño-Moncada, who had been lawfully living and working in the United States prior to November, missed his hearing and was ordered removed from the United States. PSR ¶ 78.

**C. Mr. Niño-Moncada was confronted by masked and armed Border Patrol agents and hit an empty vehicle with his truck while attempting to flee.**

Two fortunate developments preserved objective physical and video evidence in this case. First, the Portland Police Bureau (PPB) arrived on the scene quickly and did an excellent job trying to immediately secure the scene and prevent any interference. PPB bodycam footage shows a PPB officer preventing a border patrol agent from interfering with the full preservation of physical evidence; the border patrol agent was attempting to remove an unfired rifle round from the scene. Second, video evidence was preserved. Agents met with a FORA Health employee and reviewed the footage immediately after the shooting. Their 302 drafted on January 10, 2026, indicates that "none of the surveillance cameras at FORA Health contain any

evidentiary value to this investigation." BATES 375. The FORA Health employee recalls that even though the level of detail available on the video was not immediately apparent, "[t]hat day it was obvious you could see the vehicles and witnesses" on the video and agents were discussing witnesses visible in the video. Ex. D. On January 20, 2026, the defense conferred with the government regarding their intention of obtaining a subpoena of the video from FORA Health. Following that, the government reviewed the video again and determined that it contained footage of the actual incident. Following that determination, the government promptly made the video available to defense counsel. Both FORA Health and PPB should be credited for helping to preserve objective evidence of this incident.

The offense conduct occurred in January of 2026, while Operation Metro Surge was ongoing in Minneapolis. It occurred a day after the highly publicized shooting of Renee Good in her vehicle. Mr. Niño-Moncada pulled into the parking lot of Adventist Health for his passenger to attend a medical appointment. He was followed into the parking lot by three unmarked vehicles operated by Border Patrol agents including a Black Hyundai. PSR ¶ 18a. The agents parked behind Mr. Niño-Moncada and then exited their vehicles. It is unclear what exactly the agents were wearing. Witness reports indicate that while they were not dressed in any kind of standard uniform, they may have had at least some law enforcement markings visible. PSR ¶ 38. Another witness indicates that after the shooting at least one agent put on new clothing with

more visible law enforcement markings. Ex. C.[5] At the time PPB arrived, they were dressed irregularly in street clothes, but with visible law enforcement markings. Ex. D.

The agents moved towards the vehicle with weapons displayed and began to use their loaded firearms to bang on the windows of the vehicle. PSR ¶ 38. This included an AR-style rifle that was at some point used to try to smash the glass of Mr. Niño-Moncada's truck. Some of the agents had their faces covered to hide their identities, a style that unfortunately emulates the tactics of irregular forces used to repress civilians in Venezuela.[6] *See American Association of University Professors v. Rubio*, 802 F.Supp.3d 120, 174 (D. Mass. 2025) (noting the incongruity between masked police and American tradition). These tactics would be terrifying to anyone, especially to someone who has experienced political violence before.

After agents confronted Mr. Niño-Moncada, he reversed the truck, hitting the black Hyundai. Sometime after Mr. Niño-Moncada began backing up, BP5 fired two shots into the pickup truck, striking both Mr. Niño-Moncada and the passenger. The precise order of events would have been closely contested at trial. Mr. Niño-Moncada's position is that the physical evidence and video is most consistent with BP5 shooting Mr. Niño-Moncada as BP5 moved towards the truck and while BP5 was not in a position to be hit by the truck; he likely fired to

[5] This witness witnesses' impressions about other details (particularly the description of agents "T-Boning" the truck) proved incorrect. That does not appear to be due to her providing anything other than a truthful account, but rather reaching conclusions based on incomplete information.

[6] In Venezuela this force is called the Special Action Force or FAES. Formerly a unit intended to address gang violence, as of 2019 they were ordered to crackdown on neighborhoods perceived to be opposed to the regime. They are deputized and heavily armed after short periods of basic training. They conceal their faces with balaclavas to hide their identities. *See Maduro Turns to Special Police Force to Crush Dissent*, N.Y. Times January 30, 2019 (available at https://www.nytimes.com/2019/01/30/world/americas/venezuela-maduro-protests-faes.html).

prevent the truck from fleeing rather than in self-defense. Ex. D; *see also* PSR ¶ 32a ("[a]s defense counsel notes in their attached objection letter, this conclusion is consistent with video footage that depicts an individual walking around the medical facility at the time of the shooting. Just before re-entering the building, that individual stops and reacts, as if to a loud noise. When the surveillance footage is synchronized, that reaction matches a moment in the video when an individual appears to walk toward (rather than away from) the Toyota with their arm stretched out in front of them."). When PPB arrived at the scene of the shooting, Border Patrol agents demonstrated the position of the shooter at the time of the shooting:




That position matches the position of the individual walking towards the Tacoma on the FORA video. The position of the Tacoma at the moment the individual approaches the vehicle is consistent with the position of broken glass on the scene from the side window of the truck.

This is not consistent with BP5's account. First, BP5 did not indicate that he was in danger from the truck and decided to shoot the driver 3-5 seconds later. Instead, he said he was in danger from the truck moving directly towards him and fired into the truck "in the same movement" as moving away from the vehicle. BATES 327. But the individual who approached the truck with outstretched arms was moving *towards* the truck from a position of safety. Even aside from the video evidence, this account has never been consistent with physical evidence because the shots came through the *side* window of the truck and were shot at an angle to hit *both* Mr. Niño-Moncada and his passenger. It is physically impossible to have been both in front of the truck and to the side of the truck at the same instant. BP5's account that he was grazed by the truck is similarly unsupported by any video or physical evidence. He did not report any injury at the time of the shooting and only made the report later. There is no moment on the video where any individual can be seen rapidly moving out of the way of the truck to the side window as BP5 recounts. However, this Court does not need to make a finding on this issue to determine a fair sentence for Mr. Niño-Moncada's act of property destruction.

Regardless of the facts surrounding the shooting itself, Mr. Niño-Moncada had no justification for backing his truck into the empty Hyundai at least three times, totaling the vehicle. He accepts responsibility and punishment for that conduct. Mr. Niño-Moncada's decision was made in a moment of panic and does not reflect a pattern of combative or defiant behavior.

Mr. Niño-Moncada has experienced serious consequences for that decision. He has experienced harsh conditions of incarceration, having to recover from gunshot wounds while in jail. The Court has discretion to consider the realities of the experience an individual will have or has had while in custody when determining a sentence under 18 U.S.C. § 3553(a). *See United States v. Henareh*, 2021 WL 119016, *3 (S.D.N.Y. Jan. 12, 2021); *United States v. Caty*, 264 F.3d 191, 196–97 (2d Cir. 2001); *United States v. Rodriguez*, 492 F.Supp.3d 306, 311 (S.D.N.Y. 2020). Courts have frequently considered this factor when determining whether to resentence defendants due to the harsh conditions prisoners faced during the pandemic. *See*, *e.g.*, *United States v. Amerson*, 2023 WL 4497767 at *5-6 (E.D.N.Y. Jul. 12, 2023) (considering a defendant's lack of appropriate medical treatment and conditions of confinement); *United States v. Willis*, 663 F.Supp.3d 1203 at 1211 (D. Or. 2023) (considering conditions of incarceration during the pandemic).

Receiving medical treatment in jail is terrifying, not only because of the quality of care, but because of the total lack of control and empowerment incarcerated individuals have in ensuring that they receive proper care. Mr. Niño-Moncada still describes feelings of intense trauma surrounding his experiences. He continues to experience night terrors. While recovering from the shooting he had a serious infection and treatment was delayed. He has also lost two teeth. As of sentencing he will have been incarcerated for more than eight months. He has never been incarcerated before and has no prior criminal convictions.

**Conclusion**

This Court should adopt the joint recommendation of the parties and joined by probation, and sentence Mr. Niño-Moncada to a term of time served. That sentence is just below the

applicable guideline range. Following sentencing Mr. Niño-Moncada will still be incarcerated for several weeks awaiting deportation to Venezuela. Considering all of the factors in this case a sentence of time served is sufficient, but not greater than necessary.

Dated: September 11, 2026

*/s/ Michael Charles Benson*
Michael Charles Benson, AK Bar No. 1311070

*/s/ Peyton Lee*
Peyton Lee, OSB No. 164224